IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00110-RMR-TPO

RYAN BARRY,

      Plaintiff,

v.

COLORADO DEPARTMENT OF CORRECTIONS,
MATTHEW HANSEN, Director of Prisons,

     *The San Carlos Correctional Facility Defendants*:

PATSY HARTLEY, Warden,
PATRICK FHUERE, Associate Warden,
TIFFANY VOGEN, Captain,
ROB SMITH, Lieutenant,
HOLLY GALKOWSKI,[1] Sargeant,
ANDREA WARD, Sargeant,
BRITTANY ARNOLD, Correctional Officer,
WALEED ROBINSON, Case Manager,
DENI CEZ MONTANO, Correctional Officer,
ROBIN LYNN EDDY, Correctional Officer,
JIMMY L. CHURICH, Correctional Officer,
ERIKA MASCARENAS, Correctional Officer,
PENNY MCCARL, Correctional Officer,
JOHNSON (full name unknown), Correctional Officer,

     *The Arkansas Valley Correctional Facility Defendants*:

MARK FAIRBAIRN, Warden,
LINDSAY GOUTY, Health Services Administrator,
DR. RANDOLPH MAUL,
JEREMIAH VELASQUEZ, Physician's Assistant,

---

[1] Based on statements by defense counsel, this Court replaces the originally identified Defendant "f/n/u Ritolo" with the name Holly Galkowski. *See* ECF 94 at p. 2, n. 1.

*The Centennial Correctional Facility Defendant*:

ANTHONY GOODSELL, Health Services Administrator,

Defendants.

---

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Timothy P. O'Hara, United States Magistrate Judge.**

This case is before the Court upon Defendants' Motions to Dismiss. ECF 46, 78, 94. The Motions are fully briefed. The Court finds that oral argument will not materially assist in the Motions' adjudication. Based on the Parties' arguments and having reviewed the relevant portions of the record, the Court recommends as follows:

### BACKGROUND

Plaintiff's claims for relief cover two different episodes during his incarceration. The first part concerns his time at the San Carlos Correctional Facility during which he was the victim of sexual assault by Defendant McCarl, the investigation into it, and his transfer away from that facility. The second part concerns events after his transfer from the San Carlos Correctional Facility and relate to his physical health and medical care.

For purposes of this ruling, this Court accepts as true the factual allegations—as opposed to any legal conclusions, bare assertions, or conclusory allegations—that Plaintiff raises in his Complaint (ECF 1). The Court construes those well-pleaded allegations in the light most favorable to him. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006); *see also Boulter v. Noble Energy*, 521 F. Supp. 3d 1077, 1082 (D. Colo. 2021) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)).

## I.    San Carlos Correctional Facility

### A.    Plaintiff Begins Specialized Mental Health Care

Plaintiff reports a long history of severe mental illness. A competency review performed in April 2016 resulted in diagnoses of major depressive disorder with psychotic features, Tourette's disorder, panic disorder, paranoid personality disorder, specific learning disorder, and adult antisocial behavior. *See* ECF 1 at ¶ 30. In August 2021, while in the Arkansas Valley Correctional Facility, Plaintiff attempted suicide. *See id.* at ¶ 32.

His attempted suicide prompted his transfer to the San Carlos Correctional Facility. *See id.* at ¶ 33. Both he and his mother were optimistic about the transfer there because it offered the best mental health care program for Plaintiff. *See id.* at ¶¶ 33, 70.

Also in August 2021, Plaintiff "began to experience extreme pain, numbness and tingling, and palpitations. He was sent to the hospital and referred to a neurologist," but the referral was denied. *Id.* at ¶ 75. However, Plaintiff raises no complaints about the quality of his physical health care at that time or later at the San Carlos Correctional Facility.

He was transferred from the Arkansas Valley Correctional Facility to the San Carlos Correctional Facility in October 2021. *See id.* at ¶¶ 33, 75.

### B.    Sexual Assaults

Starting in January 2022, Defendant McCarl, a correctional officer at the San Carlos Correctional Facility, began sexually assaulting Plaintiff. This continued into March 2022. *See id.* at ¶¶ 35, 43. Plaintiff alleges that Defendant McCarl "took advantage of [his] mental disabilities and extreme vulnerability" as well as "groom[ed] him so she could sexually assault him." *Id.* at ¶ 35. Plaintiff identifies several ways in which Defendant McCarl coerced and manipulated him into

sexual activity. For example, Plaintiff gave him oxycontin for the physical pain that he had been experiencing since August 2021. *See id*. at ¶¶ 36-40. In a phone call that took place after his transfer out of the San Carlos Correctional Facility, Defendant McCarl told Plaintiff's mother that she was in love with Plaintiff. *See id*. at ¶ 50. Plaintiff asserts that because of his mental health disabilities and the ways in which Defendant McCarl groomed and coerced him, he "had no capacity to refuse consent to [the] sexual contact." *Id*. at ¶ 44.

At some unspecified time, Plaintiff reported the sexual assaults to his case manager, Defendant Robinson. Defendant Robinson took no protective action in response but instead gave Plaintiff an "atta boy". *See id*. at ¶ 52.

Plaintiff filed a grievance in April 2022 reporting that "he had been a victim of sexual assault perpetrated by Defendant McCarl between January and March 2022." *Id*. at ¶ 66. "[I]n March 2022, Defendant McCarl was placed on administrative leave, and she resigned in April 2022." *Id*. at ¶ 46.

Defendant McCarl later was charged with the criminal offenses of unlawful sexual conduct by a peace officer; sexual conduct in a correctional institution; and official misconduct. Defendant McCarl pleaded guilty to the official misconduct charge and was sentenced to one year of probation. *See id*. at ¶ 48.

Defendant McCarl had one previous inappropriate sexual relationship with a DOC inmate, for which she had been disciplined and about which Defendants Warden Hartley, Associate Warden Fhuere, and Captain Vogen knew. *See id*. at ¶¶ 59-60. Defendant Smith told Plaintiff that he knew Defendant McCarl "was doing 'inappropriate stuff' with other inmates at San Carlos." *Id*. at ¶ 56.

C.    **San Carlos Defendants' Awareness of the Sexual Assaults**

Plaintiff alleges that the San Carlos Defendants "all knew about Defendant McCarl's assaults against [him] and that [he] faced an obvious risk of sexual assault from Defendant McCarl." *Id*. at ¶ 49. Plaintiff identifies several sources that would indicate that the San Carlos Defendants were aware of what was happening:

(1)    One source is Defendant McCarl herself. She told Plaintiff's mother "that all the staff at San Carlos knew what was going on with Defendant McCarl and [Plaintiff]." *Id*. at ¶ 50. She also said that her best friend, Defendant Arnold, "knew about her sexual relationship with [Plaintiff]." *Id*.

(2)    A second source are Defendants Vogen and Mascarenas who told Plaintiff that they  knew what was happening. *Id*. at ¶¶ 51, 53, 56. Defendant Vogen "knew 'stuff' was happening that 'wasn't appropriate' and she reported it, but nothing happened." *Id*. at ¶ 51. Defendant Mascarenas repeatedly made comments to Plaintiff that "revealed her knowledge." *Id*. at ¶53.

(3)    A third source are Defendants who had their own independent reasons to know about what was happening. Defendant Montano, for example, relayed messages between Defendant McCarl and Plaintiff. *See id*. at ¶ 54. Defendant Ward "knew about Defendant McCarl's visits with [Plaintiff] that occurred outside the regular course of business at the facility." *Id*. at ¶ 55. Defendant Smith told Plaintiff that "he knew Defendant McCarl was doing 'inappropriate stuff' with other inmates at San Carlos." *Id.* at ¶56.

Of the named San Carlos Defendants, Defendant Captain Vogen was Defendant McCarl's

supervisor and oversaw the graveyard shift that Defendant McCarl worked. *See id.* at ¶ 51. Plaintiff

fails to identify when the Defendants gained awareness of Defendant McCarl's behavior.

As for the remaining San Carlos Defendants—Eddy, Churich, Galkowski, and Johnson—

Plaintiff simply alleges that they "also knew about" the sexual assaults without elaboration as to

how. *Id.* at ¶ 58.

### D.    Denial of Mental Health Care

In late March 2022, Plaintiff was transferred from the San Carlos Correctional Facility to

the Centennial Correctional Facility. *See id.* at ¶ 73. Leaving the San Carlos Correctional Facility

meant that he lost access to the specialized mental health care that he had there—and at the time

when he needed mental health care the most. *See id.* at ¶¶ 72-73. The reason for that transfer, he

alleges, was for being a victim of, and reporting, sexual assault. *See id.* at ¶ 73. Had he not

complained about it, he reasons, he would not have lost access to that facility's specialized mental

health care. *See id.* at ¶ 146.

Plaintiff identifies two specific Defendants as responsible for the transfer. Plaintiff alleges

that Defendants Warden Hartley and Associate Warden Fhuere transferred him because he was a

victim of, and reported, sexual assault. *See id.* at ¶ 73. Plaintiff adds that Defendant Associate

Warden Fhuere said the transfer was because Plaintiff had "compromised staff." *Id.* at ¶ 74.

The Office of the Inspector General opened an investigation in August or September 2022.

Plaintiff alleges that the investigators "forc[ed] him to have phone sex with Defendant McCarl

while they listened" during which they laughed at him or at the situation. This had the effect of

retraumatizing and revictimizing him. *Id.* at ¶ 68.

## II.    Denial of Physical Health Care

Plaintiff "continued to have physical and mental health issues" after his transfer to the Centennial Correctional Facility (Centennial) in late March 2022. *Id*. at ¶ 68. This Court notes, however, that he does not specify what they were, and he does not allege that the medical care provided was deficient during his first four months at Centennial.

In August 2022, Plaintiff was found in his cell unconscious and bleeding. He was taken to the hospital where he ultimately was diagnosed with spinal stenosis and disk degeneration. *See id*. at ¶ 77. The hospital prescribed gabapentin (a pain medication), intensive physical therapy, occupational therapy five to six times a week, a walker, a wheelchair, a portable urinal, a back brace, and a cane. *See id*. at ¶ 78. In August or September 2022, Plaintiff was transferred to the Colorado Territorial Correctional Facility, first to that facility's infirmary and then to its medical unit. *See id*. at ¶ 79. Plaintiff was optimistic about being at the Colorado Territorial medical unit because it provided the medical services that he needed for his physical health condition. *See id*. at ¶ 80.

However, his stay at the Colorado Territorial medical unit was short—just five days. He was transferred from there back to the Arkansas Valley Correctional Facility, a facility that lacked the medical services that he needed. *See id*. at ¶ 81.

Plaintiff says that Defendant Hansen made the decision to transfer him out of the Colorado Territorial Correctional Facility. The reason Defendant Hansen gave for the transfer was because the former boyfriend or husband of Defendant McCarl worked at Colorado Territorial. Plaintiff alleges that the only reason why he could not stay at Colorado Territorial (where he could receive needed medical treatment) was retaliation against him because he was a victim of, and reported,

7

sexual assault. *See id*. at ¶ 82.

Plaintiff was incarcerated at the Arkansas Valley Correctional Facility from September 2022 to July 2023. During his time there, he was denied prescribed and necessary medication, equipment, devices, and care for his medical condition and physical disabilities. *See id*. at ¶¶ 83-84. Plaintiff alleges that the Arkansas Valley Defendants denied him needed medical care and assistive devices in retaliation for reporting the sexual assaults. *See id*. at ¶ 85. Defendant Warden Fairbairn described Plaintiff's behavior as "manipulative" and removed his equipment and care aide because they were "detrimental". *Id*. at ¶ 86.

The denial of his needed medical devices and medication caused Plaintiff unnecessary pain and other physical symptoms.

During his time at the Arkansas Valley Correctional Facility from September 2022 through to July 2023, he suffered secondary injuries and indignities without the prescribed aids and devices. *See id*. at ¶¶ 87-96.

In July and August of 2023, Plaintiff was at the "DRDC infirmary", *see id*. at ¶¶ 94-97, which this Court presumes to be reference to the Denver Reception and Diagnostic Center. While there, he temporarily was given a walker. He also was given a cane, but the cane provided insufficient "support to address his needs." *Id*. at ¶¶ 94, 96.

In August 2023, Plaintiff was transferred back to the Centennial Correctional Facility. Defendant Goodsell denied him a walker and a care aide despite knowing Plaintiff's need for them. Lacking needed auxiliary aids, Plaintiff fell several times, twice resulting in serious injury. *See id*. at ¶¶ 97-99.

### III.    Transfer to the Sterling Correctional Facility

Plaintiff filed a PREA complaint in early December 2023 after another inmate sexually assaulted him. The attacker knew about the accusation and threatened Plaintiff when left alone with him. Prison officials met with Plaintiff and decided to transfer him from the Centennial Correctional Facility to the Sterling Correctional Facility (Sterling). That transfer occurred in late December 2023. The transfer was done despite Plaintiff's objection. At Sterling, he did not obtain the physical and mental health care that he needed. *See id.* at ¶¶ 100-101.

Plaintiff attempted suicide on December 21, 2023. He was hospitalized for resulting injuries. Thereafter he was kept in isolation and restrained. *See id.* at ¶ 102.

Despite an obvious need for intensive mental health treatment, Defendant CDOC refused to transfer Plaintiff to the San Carlos Correctional Facility or to the Centennial Correctional Facility, both of which had a residual treatment program. The Sterling Correctional Facility lacked an intensive treatment program. *See id.* at ¶ 103.

### LEGAL STANDARDS

### I.    Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of a plaintiff's complaint. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that a plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678. *Twombly* requires a two-prong analysis. First, a court must exclude from consideration "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Iqbal*, 556 U.S. at 679–80. Second, a court should focus on the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, then that claim survives the motion to dismiss. *See id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). Thus, while the Rule 12(b)(6) standard does not require a plaintiff to establish a prima facie case in a complaint, the elements of each cause of action may help to determine whether the plaintiff has set forth a plausible claim. *See Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556

U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct," the complaint has made an allegation, "but it has not shown that the

pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## II.    Section 1983, Generally

Plaintiff brings suit pursuant to 42 U.S.C. § 1983. "The injury that is the 'basis of action'

in a § 1983 claim is the violation of a constitutional right." *Romero v. Lander*, 461 F. App'x 661,

667 (10th Cir. 2012). Moreover, a claim for relief under § 1983 is limited to individual liability for

personal involvement in causing a constitutional violation. *See Foote v. Spiegel*, 118 F.3d 1416,

1423 (10th Cir. 1987); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976). A plaintiff

must establish how the individual defendant caused or participated in the constitutional violation

and how the individual defendant did so with the requisite state of mind. *See Mauchlin v. Davis*,

No. 12-cv-01449-RM-BNB, 2014 WL 5069547, at *4 (D. Colo. Oct. 9, 2014) (discussing how to

plead an analogous *Bivens* claim). Plaintiffs must specify *who* did *what* to them. *See id*.

## III.    Deliberate Indifference (to a Risk of Harm)

The Eighth Amendment of the United States Constitution sets the standards and obligations

for the treatment of those incarcerated based on criminal convictions and the conditions of their

confinement. It stems from a convict's constitutional right to be free of cruel and unusual

punishment.

The Eighth Amendment applies in several different ways in the prison context.  One such

manifestation is prisoner safety. A prison official violates a prisoner's Eighth Amendment right if

s/he is deliberately indifferent to a substantial risk of serious harm. Another manifestation is

11

prisoner health. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 (1993); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976). A prison official violates a prisoner's constitutional right if s/he is deliberately indifferent to a prisoner's serious medical need. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Estelle*, 429 U.S. 97, 104 (1976))

In whatever context a claim of deliberate indifference is made, the claim consists of the same basic two parts: an objective and a subjective component. *Id.* (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

### A.    Substantial Risk of Serious Harm

The first element of the cause of action requires harm that is sufficiently serious to constitute the "denial of the minimal civilized measure of life's necessities." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at834)*; see also Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998). This element is determined objectively. *Id.* (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993)). "[A] conclusory claim of being afraid and aggravated" will not suffice. *Riddle v. Mondragon*, 83 F.3d 1197, 1205 (10th Cir. 1996). Nor does the mere existence of a preventative policy alone show a risk of harm to be obvious. *See Hovater*, 1 F.3d at 1068.

### B.    Failure to Protect

Next, a plaintiff must show that the defendant was subjectively aware of that substantial risk of serious harm but was deliberately indifferent to it. *Mata*, 427 F.3d at 751 (citing *Estelle*, 429 U.S. at 106). This element consists of several parts.

1.      Knowledge of the Risk of Harm

First, a plaintiff must show that the defendant officer (1) actually was aware of facts (2) from which the inference could be drawn that a substantial risk of harm exists (3) and the defendant drew that inference. *See Tafoya*, 516 F.3d at 916 (citing *Farmer*, 511 U.S. at 834). A plaintiff need not go so far as to show the defendant's awareness of the specific way in which s/he actually suffered harm but rather awareness of a substantial risk of the serious harm could occur in a more general sense. *See Farmer*, 511 U.S. at 842-44.

Alternatively, case law allows a jury to infer a defendant's actual knowledge if the risk of serious harm was so obvious that a reasonable person would realize it. *See Tafoya*, 516 F.3d at 916 (citing *Farmer*, 511 U.S. at 842 and *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Knowledge likewise can be imputed on a defendant constructively if the underlying constitutional misconduct "was so widespread or flagrant" that "the governing body should have known of it." *Jojola v. Chavez*, 55 F.3d 488, 491 (10th Cir. 1995) (internal citation omitted).

2.      Disregard of that Risk of Harm

However, "[i]t is not enough to establish that the official should have known of the risk of harm;" a prison official only is liable if s/he knows of excessive risk to inmate health and safety and disregards it. *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005) (citing *Pulsipher*, 143 F.3d at 1310). A plaintiff must demonstrate that despite such awareness, the defendant, with a sufficiently culpable state of mind, "fail[ed] to take reasonable steps to alleviate that risk." *Tafoya*, 516 F.3d at 916. Generally, "a failure to adhere to administrative requirements does not equate to a constitutional violation." *Hovater*, 1 F.3d at 1068, n. 4. More than negligence, even gross negligence, is required. *Id.* at 1066. Rather, a plaintiff must show a reckless disregard on the

defendant's part towards the known risk of harm. In other words, inaction that is tantamount to the defendant's acquiescence to the risk of harm. However, a plaintiff need not go so far as to establish that the defendant intended for the specific harm to happen. *See Mauchlin*, 2014 WL 5069547 at *4.

### 3.    Individual Culpability

Lastly, "it is particularly important" that a plaintiff "make clear exactly who is alleged to have done what to whom, to provide each individual [defendant] with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations" against an entire group of defendants." *Lovato v. Mahler*, No. 21-cv-01986-RMR-MDB, 2023 WL 2613821, at *3 (D. Colo. Mar. 23, 2023) (citing *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011)). A plaintiff cannot hold a group of defendants collectively at fault. Rather, a plaintiff must specify how each defendant in the group took individual action or failed to take action for which each defendant can be faulted.

### C.    **Supervisory Liability**

"Deliberate indifference", by its very nature, implies direct personal knowledge and direct personal action (or more accurately the failure to take a needed action). Consequently, a prison official cannot be found liable solely by virtue of being the supervisor or employer of someone who was deliberately indifferent. In other words, there is no vicarious liability. *See Dodds v. Richardson*, 614 F.3d 1185, 1194-95 (10th Cir. 2010). Moreover, "the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). Instead, to hold a supervisor liable, there must be an affirmative link between the supervisor and the subordinate's violative

conduct. This affirmative connective link is shown through (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind. *See Dodds*, 614 F.3d at 1195-96 (listing the ways in which a plaintiff can show a supervisor's personal involvement in violative conduct). *See also Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013). In essence, a plaintiff must demonstrate the same basic two elements of deliberate indifference to hold a supervisor liable. That is, that the supervisor knew or should have known of the risk of harm but, despite such awareness, had some sort of personal involvement in allowing that harm to occur.

## IV.    Deliberate Indifference (to a Serious Medical Need)

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The cause of action has both an objective and a subjective component. *See Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). *See also, Duran v. Wellpath, LLC*, No. 23-cv-02853-CNS-NRN, 2024 WL 2939167 (D. Colo. June 11, 2024) (discussing the elements of this cause of action in depth). It is the same standard that applies to pre-trial detainees under the Fourteenth Amendment. *See Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020).

### A.    <u>Objective Component</u>

The objective component is met if "the harm suffered is sufficiently serious to implicate the Cruel and Unusual Punishment Clause." *Id.* "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751 (quoting *Sealock*, 218 F.3d at 1209). Its purpose is to limit claims to significant, as opposed to

trivial, suffering. *See Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014). "Not every twinge of pain suffered as the result of a delay in medical care is actionable." *Sealock*, 218 F.3d at 1210.

### B.    Subjective Component

To prevail on the subjective component, a prisoner must show that the defendant knew of a substantial risk of harm but still disregarded that risk by taking no reasonable measures to abate it. *See Spradley v. LeFlore Cty. Det. Ctr.*, 764 F. App'x 692, 699 (10th Cir. 2019). The inadvertent failure to provide adequate medical care does not give rise to an Eighth Amendment violation. *See id.* (quoting *Estelle*, 429 U.S. at 105–06). The Supreme Court has held that "a prison official must have a sufficiently culpable state of mind" to violate the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison medical professional who serves "solely as a gatekeeper for other medical personnel capable of treating the condition" may be liable if she "delays or refuses to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751 (citing *Sealock*, 218 F.3d at 1211); *Estelle*, 429 U.S. at 104-105) (internal quotations omitted).

A plaintiff can show the subjective component—that is, that the prison official subjectively knew of the substantial risk of harm—either by circumstantial evidence or from the very fact that the risk was obvious. *See Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). However, the fact that the risk was obvious does not by itself conclusively show subjective knowledge. It is

possible that the obvious risk still escaped the prison official's awareness or attention. *See id.*

## V.     First Amendment Retaliation

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights. [For example], officials may not retaliate against prisoners for filing administrative grievances." *Banks v. Katzenmeyer*, 645 F. App'x 770, 772 (10th Cir. 2016) (internal citations omitted). A prison official may not take an adverse action based on an improper retaliatory motive even if that adverse "action taken in retaliation would be otherwise permissible." *Hill v. Myers*, No. 18-cv-00909-RM-KLM, 2020 WL 3036068, at *4 (D. Colo. June 5, 2020) (*citing Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

To state a claim against a prison official for First Amendment retaliation, the inmate must demonstrate that: (1) s/he engaged in constitutionally protected speech activity, (2) the prison official took adverse action sufficient to chill a person of ordinary firmness from continuing to engage in that activity, and (3) it was the inmate's exercise of constitutionally protected conduct that substantially motivated the prison official's adverse actions. *See id.* (*citing Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007)).

For purposes of the second element, the plaintiff must have suffered an injury (that is, an adverse consequence) at the hands of the defendant. *See Irizarry v. Yehia*, 38 F.4th 1282, 1287-88, n.6 (10th Cir. 2022) (*citing Worrell v. Henry*, 219 F.3d 1197, 1212-13 (10th Cir. 2000)). It is an objective inquiry. *See Irizarry*, 38 F.4th at 1292.

For purposes of the third element, an inmate must show a "but for" causal relationship between the prison official's retaliatory motive and the adverse action that the plaintiff suffered. That is, "but for the retaliatory motive, the incidents to which [the plaintiff inmate] refers . . . would

not have taken place." An inmate shows this by alleging that the prison officials "were aware of his protected activity, that the inmate complained of their actions, and the retaliatory action was in close proximity to the protected activity." *Banks*, 645 F. App'x at 772. However, the mere fact of close temporal proximity alone does not necessarily show an improper retaliatory motive. *See Guy v. Lampert*, 748 F. App'x 178, 181 (10th Cir. 2018); *Hill*, 2020 WL 3036068 at *6.

Moreover, an inmate must "allege specific, objective facts from which" the retaliatory motive plausibly can be inferred. *Banks*, 645 F. App'x at 772. The plaintiff may not simply rely on his own subjective belief that the defendant acted with an improper retaliatory motive. Rather, a plaintiff must plead specific facts to make "plausible that the action was not motivated by legitimate grounds" and to show "why the particular official would be motivated to improperly harm the prisoner." *Guy*, 748 F. App'x at 181*; see also, Owens v. Zade*, No. 22-cv-00566-NYW-KLM, 2023 WL 4079412, at *6-7 (D. Colo. June 20, 2023). Retaliation as a substantial motivating factor behind a law enforcement officer's adverse action may be inferred if the law enforcement officer had no legitimate reason to take that adverse action. *See Irizarry*, 38 F.4th at 1293.

## DISCUSSION

Plaintiff brings a variety of causes of action against multiple prison employees across several different correctional institutions. Several of the named Defendants ask this Court to dismiss claims as raised against them.[2] This Court considers whether Plaintiff successfully pleads

---

[2] ECF 46: Defendants Smith and Ward (failure to protect); Defendants Maul, Gouty, Hansen, Fairbarn, Velasquez, and Goodsell (retaliation); Defendants Maul, Gouty, Fairbarn, Velasquez, and Goodsell (deliberate indifference); CDOC, Hartley, Fheure, Vogen, Smith, and Ward (failure to train/supervise); CDOC (ADA and Rehabilitation Act); Defendants Fheure, Smith, Ward, Maul, Gouty, Vogen, Hansen, Fairbarn, Velasquez, and Goodsell (qualified immunity).
ECF 78: Defendants Churich and Mascarenas (failure to protect and qualified immunity).
ECF 94: Defendants Eddy, Galkowski, and Montano (failure to protect and qualified immunity).

those claims against the moving Defendants in turn below.

## I.    Deliberate Indifference (Failure to Protect from Risk of Harm)

Underlying Plaintiff's Third Claim for Relief is the sexual misconduct by Defendant McCarl against him during his time at the San Carlos Correctional Facility. Plaintiff brings his Third Claim for Relief against thirteen Defendants who worked at that facility. This cause of action is based on the Eighth Amendment right to safe prison conditions, which includes the right to be free from sexual abuse by those guarding him. *See Lovato*, 2023 WL 2613821 at *3 (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (remaining citations omitted) ("[W]hen the State take a person into its custody and holds [him] there against [his] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [his] safety and general well-being.") Plaintiff alleges that the thirteen named Defendants were deliberately indifferent to the sexual abuse that he was experiencing and that they failed to protect him from Defendant McCarl.

### A.    Substantial Risk of Serious Harm

Plaintiff must have faced a harm substantial enough to implicate the Eighth Amendment. This is the first, objective, component of a deliberate indifference claim. None of the Defendants argue for dismissal for the failure to plead this aspect. During his time at the San Carlos Correctional Facility, Plaintiff suffered a serious harm in the form of ongoing sexual assault by Defendant McCarl. Sexual assault by a prison guard is the kind of harm that implicates the Eighth Amendment. *See Tafoya*, 516 F.3d at 916. "An 'inmate has a constitutional right to be secure in [his] bodily integrity and free from attack by prison guards.'" *Barney*, 143 F.3d at 1310 (citing *Hovater*, 1 F.3d at 1068). Consequently, this Court finds that Plaintiff pleads the objective

component of the cause of action.

**B.    Defendants' Alleged Culpable Disregard of that Harm**

Plaintiff next must plead how the individual Defendants are at fault for not preventing that risk of harm. This concerns the second, subjective, prong of the cause of action, and it is the focus of Defendants' argument. They contend that Plaintiff inadequately pleads their awareness of the ongoing sexual assaults and how they failed to take preventative action. At issue here is whether Plaintiff pleads a sufficient basis by which to infer culpability of the required degree and whether Plaintiff pleads a particularized showing as to each individual Defendant. It is a legal inquiry that goes beyond whether Defendants should have done more in a general sense or were negligent in their failure to help him. Rather, it concerns the higher culpability standard of deliberate indifference, or inaction that is tantamount to the Defendants' acquiescence to the risk of harm, as case law requires for this cause of action.

1.    Awareness of the Risk of Harm

Defendant McCarl is the only correctional officer who sexually assaulted Plaintiff. Plaintiff does not allege that any other San Carlos Defendant played a direct role in causing it. Neither does Plaintiff allege that any other Defendant was present when the sexual assaults occurred or that they facilitated the sexual assaults. Rather, Plaintiff alleges the opposite: inaction and the failure to intervene. The Defendants contributed to the sexual assaults, Plaintiff contends, by learning of the assaults and not taking remedial action to stop Defendant McCarl.

To support his theory of relief, Plaintiff first must show that the Defendants actually knew about the sexual assaults and the risk that Plaintiff was facing of sexual assault from Defendant

McCarl before the assaults concluded.[3] In other words, Plaintiff must plead not only what happened to him but also what each individual Defendant subjectively perceived about it. This is an important aspect because deliberate indifference requires knowledge of the risk of harm. However, Plaintiff offers little detail or context about what exactly the moving Defendants knew, how they knew it, and, most importantly, when they learned the information.

First, Plaintiff alleges that his mental health condition was obvious and thus Defendants should have known he was incapable of giving consent. That "[a]ll Defendants knew" that Plaintiff "suffered from severe mental health disabilities" because "it was obvious (*see* ECF 1 at ¶ 31) is a very general assertion. Nor does Plaintiff allege that the Defendants had any knowledge of the specific ways in which Defendant McCarl was manipulating him.

Second, Plaintiff alleges that Defendant McCarl's prior inappropriate sexual relationship with an inmate made Defendant McCarl someone who also would target him. However, Plaintiff does not allege that the majority of Defendants knew about Defendant McCarl's previous inappropriate sexual relationship with an inmate. ECF 1 at ¶ 60 (only Defendants Hartley, Fhuere, and Vogen knew about Defendant McCarl's previous discipline). Similarly, Plaintiff alleges no factual support for the conclusory statement that Defendants knew "that Defendant McCarl was and/or is a sexual predator." *See* ECF 1 at ¶ 63(c). In other words, only three Defendants could have known that since it happened before, that Defendant McCarl posed a substantial risk of sexually assaulting either Plaintiff, specifically, or inmates generally.

Third, Plaintiff alleges that for several Defendants, their awareness of what was happening

---

[3] If a Defendant only learned of the sexual assaults after they had concluded (or too soon before they concluded to intervene), Plaintiff would have no cause of action.

was limited to unspecified "inappropriate" activity which they knew about as a matter of common knowledge. It was "widely known," Plaintiff contends. S*ee* ECF 107 at p. 5. Their subjective awareness is evident when one construes all the allegations against all the Defendants together, he furthers. *See id*. at pp. 6, 9. However, Plaintiff may not rely on an allegation of collective knowledge because the case law places the focus of inquiry on each individual Defendant. *Lovato*, 2023 WL 2613821 at *3 (citing *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (the complaint must "make clear exactly who is alleged to have done what to whom . . . as distinguished from collective allegations" against an entire group of defendants.")

The case of *Wilson v. Wilcox*, No. 14-cv-0421-MSK, 2018 WL 1304532, at *9 (D. Colo. Mar. 13, 2018), upon which Plaintiff relies, illustrates this point. The plaintiff there pleaded that all of the named defendants were inside his cell and had subdued him when he was struck and physically injured. Because that pleading left "no mystery [as to] which officers were present and in a position to use excessive force," it was sufficiently specific. The pleading here, by contrast, does not tie the Defendants as closely and unambiguously to Plaintiff's sexual assaults in an equivalent way. The Defendants' involvement here is not centered on one point in time and at one place.

Defendants Eddy, Galkowski, and Church complain about the "exceedingly threadbare and conclusory" allegations that Plaintiff makes against them. ECF 94 at p. 8. Plaintiff alleges only that they knew something inappropriate was happening as a matter of common knowledge. This Court agrees that Plaintiff does not make the required particularized showing as to them. That vague pleading leaves ambiguous what exactly these Defendants knew, why they had knowledge of it, and when they learned of the relevant information. There is the possibility that they knew

enough in time to warrant intervention, but Plaintiff does not plead enough to make plausible that they did.

What is needed at the very minimum is some sort of detail by which to link each Defendant to what was happening. Regarding Defendant Montano, for example, Plaintiff alleges that she relayed messages between Defendant McCarl and Plaintiff. *See* ECF 1 at ¶ 54. Considering that one was a correctional officer and the other was an inmate, the very fact that the two were exchanging messages reasonably supports drawing the inference that Defendant Montano knew the contents of the messages and knew about the sexual assaults. The allegation connotes a regularity to the activity and at least put Defendant Montano in close enough proximity for her to form her own independent knowledge of what was happening and thus placed Defendant Montano close enough to suspect sexual assault.

Regarding Defendant Smith, Plaintiff alleges that "he knew Defendant McCarl was doing 'inappropriate stuff' with other inmates at San Carlos." ECF 1 at ¶ 56 (emphasis added). That allegation does not indicate Defendant Smith's knowledge that Defendant McCarl was doing the same with Plaintiff. Plaintiff adds that Defendant Smith told this to him. *Id.* However, there is no indication of when the conversations occurred between Defendant Smith and Plaintiff, thus preventing any plausible claim of liability.

Regarding Defendant Mascarenas, Plaintiff alleges that "she would repeatedly make comments to [him] about Defendant McCarl that revealed her knowledge." ECF 1 at ¶ 53. That fact does not necessarily make "clear that she knew about Defendant McCarl's sexual assaults against" him. *Id.* (emphasis added). However, an inference can be drawn in Plaintiff's favor that Defendant Mascarenas was discussing the matter with Plaintiff regularly and thus could have

gained sufficient knowledge from which to suspect sexual assault.

Regarding Defendant Ward, Plaintiff alleges that she "knew about Defendant McCarl's visits with [him] that occurred outside the regular course of business at the facility." ECF 1 at ¶ 55. While that is an additional detail in one respect, it is still not a detail that suggests something more than general knowledge of some sort of inappropriate relationship. According to Plaintiff, it already was commonly known that something inappropriate was going on. The fact that Defendant Ward knew that it was occurring outside the regular course of business does not add anything to that and does not tie Defendant Ward close enough to what was happening to have personally suspected sexual assault.

With respect to this first element, this Court finds the pleadings inadequate to support the inference that Defendants Eddy, Galkowski, Church, Smith, and Ward subjectively knew that Plaintiff was the victim of sexual assault or faced such a risk. However, the Court does find the pleadings adequate to support reaching that inference with respect to Defendants Mascarenas and Montano.

### 2.    Failure to Protect

Subjective knowledge of the risk of sexual assault is one aspect of this element, as discussed above. The deliberate indifference theory also requires the failure to take protective action. For those Defendants who have moved for dismissal, the Complaint leaves wholly unstated exactly what intervening action they should have taken.

With respect to Defendants Church and Mascarenas, Plaintiff argues that they "fail[ed] to take action to attempt to have Defendant McCarl removed from a position in which she had contact with [him]"; "failed to take steps to protect [him]"; and "did not take any reasonable measures to

protect [him]". ECF 89 at pp. 2, 6. Plaintiff argues that it suffices to allege that the Defendants "did not take **any** reasonable steps to protect [him]". *Id*. at p. 6. (emphasis in the original). "Otherwise, Plaintiff would need to speculate about all the actions Defendants could have taken but did not and hope that the list was exhaustive at pains of the claim being dismissed if it was not." Plaintiff contends that the pleading rules do not require him "to have more specifically identified Defendants' . . . actions". *Id*. at p. 6. The Complaint is sufficient, he contends, to provide "each Defendant with notice to what actions or inactions they need to defend, deny, or justify." *Id*. at p. 8 (citing *Mauchlin*, 2014 WL 5069547, at *8). In this way Plaintiff appears to create a presumption that Defendants should have done something generally, which then shifts the analysis to Defendants to rebut with a specific explanation. Plaintiff argues the same with respect to Defendants Eddy, Galkowski, and Montano in his Response (ECF 107) to their Motion to Dismiss (ECF 94).

This Court disagrees with Plaintiff that he pleads enough to show how each of these Defendants acted with deliberate indifference by failing to take corrective action. Plaintiff's reliance on the general allegation that the Defendants (whether collectively or individually) should have done something, anything, is too conclusory to show the Defendants as more than merely negligent.

It is important to note that these Defendants are not alleged to have supervisory authority over Defendant McCarl. The one Defendant whom Plaintiff does identify as Defendant McCarl's supervisor, Captain Vogen (who is not one of the moving Defendants). According to the Complaint, Captain Vogen allegedly did attempt to protect him (although Plaintiff regards Captain Vogen's attempts to do so as "patently inadequate"). *See* ECF 1 at ¶ 51. Plaintiff does not allege

that he complained to any of these Defendants about what was happening or sought their help.

The Court notes Plaintiff's broad allegation as to all thirteen of the San Carlos Defendants that they "knowingly, voluntarily, recklessly and with willful disregard to his personal safety allow[ed] Defendant McCarl to continue working as a correctional officer at San Carlos and continue having sexual contact with [him]." *Id*. at ¶ 62. However, Plaintiff does not indicate how each of these Defendants had the authority to control the terms of Defendant McCarl's employment.

Conceivably, there are a variety of ways that any of these Defendants could have taken action to prevent Plaintiff's sexual assaults. However, it is for Plaintiff to specify them. It is for Plaintiff to plead this point as to each Defendant because the way in which a Defendant failed to take protective action goes part-and-parcel with making a particularized showing of how that Defendant was deliberately indifferent to the risk of harm.

Thus, even for Defendants Mascarenas and Montano for whom a reasonable inference of subjective awareness of the risk harm could be drawn, Plaintiff fails to plead the remainder of the subjective element. It follows that the existing allegations are too general to state a plausible claim of deliberate indifference.

### C.    Failure to Train/Supervise

With respect Defendants Lt. Smith and Sgt. Ward, Plaintiff argues that they "did not take any reasonable measures to protect [him] or inmates like [him]." ECF 71 at p. 9. For the reasons this Court explains above, that is the same sort of allegation that is too general and too conclusory to permit a reasonable inference of deliberate indifference. However, there is one way in which Plaintiff does specifically allege how these two Defendants failed to act. That is in the failure "to

properly hire, train, and/or supervise prison personnel, including Defendant McCarl and other San Carlos correctional officers". ECF 1 at ¶ 63(c). Plaintiff includes the three higher-ranking Defendants—Warden Hartley, Associate Warden Fhuere, and Captain Vogen—in that same allegation. Plaintiff adds that Defendants Warden Hartley, Associate Warden Fhuere, and Captain Vogen should have removed Defendant McCarl "from a position where she had contact with vulnerable inmates like [himself]." *Id.* at ¶ 61.

Plaintiff responds that he is not bringing a "failure to train/supervise" claim as a separate cause of action or theory of liability. *See* ECF 71 at n.2. Rather, he is alleging the failure to train/supervise as a way in which these Defendants caused Plaintiff's Eighth Amendment harm. *Id.* "Plaintiff asserts that each [Defendant] knew specifically that Defendant McCarl posed a specific risk of harm to inmates at SCCF yet failed to adequately protect such inmates." *Id.*

Although this part of Plaintiff's Third Claim for Relief does not lack specificity, it still lacks a plausible, supportive inference. First, there is no indication of an ongoing and wide-spread sexual assault problem at the facility, and any assertion of such by Plaintiff is conclusory. At most, the Complaint supports the inference that Defendant McCarl had engaged in inappropriate sexual relations with an inmate on at least one prior occasion (although Plaintiff includes few details about that alleged misconduct). Furthermore, the Complaint provides no indication of how (1) existing training was inadequate or (2) a lack of adequate training caused what happened to Plaintiff. Indeed, the nature of the wrongdoing that the Complaint suggests is focused on Plaintiff and Defendant McCarl, specifically, as opposed to a problem of a more systemic nature.

The way in which Plaintiff frames Defendants' wrongdoing suggests more a failure to take responsive or intervening action to stop the ongoing sexual abuse. This could be construed as a

failure to supervise Defendant McCarl. Thus, the Complaint supports the inference that Defendant McCarl's immediate supervisor, Defendant Vogen, fell short in her supervisory obligation and thus supports the inference of an affirmative link between Defendant Vogen and the sexual assaults. However, the Complaint does not support the inference of some affirmative link between higher-ranking Defendants and the sexual assaults. The most that can be inferred is that they had a supervisory obligation simply by virtue of being in Defendant McCarl's chain of command. However, that is the equivalent of respondeat superior liability which does not state a § 1983 claim. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

Thus, the Court finds that the Third Claim for Relief should be dismissed to the extent it is based on a failure to train or a failure to supervise against Defendants Hartley, Fheure, Smith and Ward. The exception is Defendant Captain Vogen for whom a reasonable inference of a failure to supervise could be made, but Defendant Vogen does not join in the Motion to Dismiss.

The Court notes that Plaintiff did not make a substantive defense to his failure-to-train and failure-to-supervise theories in his Response. *See* ECF 71 at n. 2. Rather than request Plaintiff to provide a supplemental brief on this particular aspect of his deliberate indifference claim, the Court finds that Plaintiff should be given leave to amend this part of his Third Claim for Relief.

**E. Summary**

In varying ways, the Complaint does not show as plausible how these nine Defendants were deliberately indifferent to the sexual assault that Plaintiff was experiencing. There is inadequate detail about what they knew or how they failed to act. Therefore, this Court recommends that all three Motions to Dismiss (ECF 46, 78, and 94) be granted in part, and that

Plaintiff's Third Claim for Relief be dismissed as to all nine moving Defendants (Hartley, Fheure, Smith, Ward, Church, Mascarenas, Eddy, Galkowski, and Montano). However, because there is the potential that Plaintiff could plead enough additional detail or context to take the allegation from merely possible to plausible as to any one of them, this Court recommends that the dismissal be without prejudice.

## II.    Deliberate Indifference to Medical Need

This claim relates to Plaintiff's hospitalization in August 2022 and the hospital's prescription of gabapentin (a pain medication), intensive physical therapy, occupational therapy five to six times a week, a walker, a wheelchair, a portable urinal, a back brace, and a cane. Plaintiff contends that medical care providers at different facilities after that hospitalization did not give him that full range of prescribed treatment (as well as removed his care aide[4] although presumably the hospital did not prescribe that particular form of medical care).

### A.    Objective Component---A Sufficiently Severe Medical Need

The underlying medical condition subject of this claim is the diagnosis of spinal stenosis and disk degeneration. *See* ECF 1 at ¶ 77. Plaintiff alleges that in August 2021 (during a previous incarceration at the Arkansas Valley Correctional Facility) he was sent to the hospital after he began to experience "extreme pain, numbness and tingling, and palpitations." ECF 1 at ¶ 75. However, apart from being referred to a neurologist, Plaintiff provides no more information about this particular medical situation. In August 2022, while housed in Centennial, he visited the hospital again. ECF 1 at ¶ 76. Nevertheless, the Complaint shows that he had been in physical pain

---

[4]    Defendants explain that the term "care aide" means another inmate who assists Plaintiff with certain routine tasks. ECF 46 at p. 12.

since August 2021 and during the time of January to March 2022 when he was at the San Carlos

Correctional Facility. *See id*. at ¶ 40 (during the three months when he was sexually assaulted).

Plaintiff alleges that a range of treatment that was later prescribed in August 2022

following a visit to the hospital demonstrates the severity of his medical condition. *See id*. at ¶ 78.

Plaintiff alleges he was denied "needed medical care and assistive devices" which caused

"unnecessary pain" and a variety of secondary medical problems and injuries. *See id*. at ¶¶ 87-99.

Defendants do not dispute that Plaintiff pleads a medical need of sufficient severity to meet

the objective element of the cause of action. This Court finds the foregoing sufficient to show the

existence of a severe medical condition in the form of back pain.

### B.    Subjective Component---Deliberate Indifference

To be clear, Plaintiff does not allege that wholesale refusal of any medical care for his back

condition. Twice, he was sent to the hospital for back pain. ECF 1 at ¶¶75-76. Rather, he alleges

that medical care providers and administrators—as well as one warden—in two different

institutions refused to provide on a consistent, ongoing basis the full range of prescribed medical

care after the second hospital visit.

Plaintiff identifies multiple different categories of medical need. First, he says that he

should have been kept at facilities that offered the kind of physical health care that he needed. ECF

1 at ¶¶ 144, 153. Second, he says that he needed medical devices and equipment such as ambulatory

aides and a shower chair as well as necessary pain medication. *Id.* Third, he says that he needed a

care aide (*id.* at ¶ 98), but the basis for considering that as a medical need is unexplained. Plaintiff

does not say that the hospital had prescribed a care aide, and he does not explain why one was

provided initially. Fourth, he says that he needed an adult diaper, but he does not report being

diagnosed with, or seeking medical care, for incontinence. He also says that he needed a portable urinal, which was part of hospital's prescription. This Court assumes that Plaintiff needed these last two accommodations even if his cell had a toilet.

With the exception of Defendant Fairbairn, Plaintiff makes no indication at all of what each individual Defendant knew and what action each individual Defendant should have taken. Rather, Plaintiff holds all the named Defendants collectively responsible for all denials of all prescribed treatment forms. As Plaintiff frames it, the medical care providers (Defendants Gouty, Maul, and Velasquez) are responsible for his transfers to facilities with inadequate medical care services (even though it is unclear whether they had such transfer authority). Plaintiff's conclusory approach fails short of what a Section 1983 claim generally requires. *See Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013); *see also Villa v. D.O.C,*. 664 F. App'x 731, 733 (10th Cir. 2016) (stating the need for specificity in pleading an Eighth Amendment or ADA claim against a prison defendant).

This Court adds that Plaintiff makes no link between the denial of occupational therapy (separate and apart from physical therapy) and the difficulties he encountered after his August 2022 hospitalization from his back pain. Nor does Plaintiff specify what correctional facility offered the kind of occupational therapy prescribed.

1.    Arkansas Valley Defendants

Plaintiff alleges that during his time at the Arkansas Valley Correctional Facility—September 2022 to July 2023—he was denied the full range of prescribed treatment as well as a care aide. *See* ECF 1 at ¶ 84. The Arkansas Valley Correctional Facility Defendants against whom Plaintiff brings this claim are Warden Fairbairn; Health Services Administrator Gouty; Dr. Maul;

and Physician's Assistant Velasquez.

### a.    Defendants Maul, Gouty, and Velasquez

Plaintiff says nothing about the circumstances in which he interacted with Defendants Maul, Gouty, and Velasquez. They are merely part of the group that was "on notice of Mr. Barry's medical and physical disability assistance needs and had a duty to ensure that such needs were met." ECF 1 at ¶83 (referring to Defendants Fairbairn, Maul, Gouty, and Velasquez). They were also among the group labeled as the "Retaliation Defendants." ECF 1 at ¶144 (referring to Defendants Hartley, Fhuere, Hansen, Maul, Gouty, Fairbairn, Velasquez, and Goodsell). The implication is that to some extent at least, these three Defendants became aware of Plaintiff's medical condition and made some decision over what kind of medication and medical equipment Plaintiff should receive (ECF 1 at ¶ 83), however no specifics are pleaded whatsoever. Plaintiff's claim rests on the assumption that following his hospital visit, all subsequent medical care providers were bound to comply with the hospital's prescribed course of treatment, without any latitude for disagreement or difference in approach. Plaintiff alleges the denial of "necessary medication" (ECF 1 at ¶ 83), but he does not say whether he was given an alternative pain medication.

Based on the allegations in the Complaint, these three Defendants cannot be held liable under § 1983 for a constitutional violation.

### b.    Warden Fairbairn

The only specific detail that Plaintiff pleads is in regards to Defendant Fairbairn, the warden at the Arkansas Valley Correctional Facility. According to Plaintiff, Defendant Fairbairn described his behavior as "manipulative" and removed his "equipment and care aide" because they

were "detrimental." *See* ECF 1 at ¶ 86. The implication is that even though he was the warden and not a medical care provider, Defendant Fairbairn still made a decision that affected the scope of medical treatment that Plaintiff received. Another implication is that Defendant Fairbairn personally saw no genuine need for the full range of treatment modalities that the second hospital had prescribed.

Defendant Fairbairn argues that this shows he did not act with deliberate indifference, but rather for "a well-reasoned decision based on [Plaintiff's] conduct and/or the status of his health." *See* ECF 83 at n. 2. However, the way that Plaintiff frames the allegation does not leave it conclusive that Defendant Fairbairn acted with a legitimate reason, and therefore, this Court construes the inference in Plaintiff's favor. That is, that Defendant Fairbairn wrongly disagreed with the need for those forms of treatment despite knowing that Plaintiff was a genuine fall risk.

2.    The Centennial Defendant

 In August 2023, Plaintiff was transferred from the Arkansas Valley Correctional Facility to the Centennial Correctional Facility. Defendant Goodsell was the Health Services Administrator at the Centennial Correctional Facility. Plaintiff alleges that Defendant Goodsell denied him a walker and a care aide. As with the Arkansas Valley Defendants, there simply is no context or background to explain how Defendant Goodsell, in a supervisory or administrative capacity, subjectively knew that Plaintiff needed a walker or a care aide and despite perceiving that need, refused to provide it.

C.    Summary

This Court accepts as true for present purposes that Plaintiff has a severe and painful back condition for which he needs at least ambulatory aids and other auxiliary devices on a permanent

basis. However, Plaintiff makes no link between that medical need and the named Defendants' omissions. It is altogether unknown how each of the Defendants who move for dismissal individually knew of the medical need and disregarded it. Namely, there is no context for how Plaintiff sought this medical care at either the Arkansas Valley or Centennial Correctional Facilities. The simple fact that one medical care provider (the second hospital) had prescribed it and various prison officials at two different facilities did not fully comply with that prescription alone does not elevate the claim from a disagreement about the appropriate form of medical care to a constitutional violation. The only Defendant for which there is some sort of alleged link is Defendant Fairbairn.

    As a result, this Court recommends that the Motion to Dismiss at ECF 46 be granted as to this claim—Plaintiff's Fifth Claim for Relief—as to Defendants Maul, Gouty, Velasquez, and Goodsell. Because there is the potential that Plaintiff could plead this claim against any one of them better, this Court recommends further that the dismissal be without prejudice. This Court recommends that the Motion to Dismiss [ECF 46] be denied as to Defendant Fairbairn.

## III.    First Amendment Retaliation

    Plaintiff raises several alternative theories for why Defendants are culpable for the denial of medical care including prison transfers to the extent they restricted his access to health care. For his Fourth Claim of Relief, Plaintiff expresses the wrongdoing in terms of First Amendment Retaliation.

### A.    The First Two Elements Are Not in Dispute

    The first element of this cause of action requires Plaintiff to plead that he engaged in constitutionally protected speech activity. Plaintiff bases this element on his report of being a

victim of sexual abuse and his accusation against Defendant McCarl. Plaintiff reported the sexual assaults to his case manager. ECF 1 at ¶ 52. Then, he filed his first administrative grievance about the sexual assaults in April 2022 (ECF 1 at ¶ 66), at which time Defendant McCarl resigned (*id*. at ¶ 46). Plaintiff pursued those grievances until June 2022. *See id*. at ¶ 66. Plaintiff thereby "engaged in the protected activity of petitioning the government and engaging in free speech by complaining to DOC about Defendant McCarl's sexual misconduct against him." *Id*. at ¶ 142. This Court assumes for present purposes that these allegations suffice to plead the first element.

Plaintiff pursued the grievance while he was at the San Carlos Correctional Facility. This occurred in April 2022. The CDOC's Office of the Inspector General began its own investigation in August or September 2022. Plaintiff argues in his Response that all of the Defendants against whom he brings his retaliation claim knew about his grievance because that information "would be in his file." *See* ECF 71 at p. 12. Whether all of the Defendants who now seek dismissal actually knew (or had reason to know) of Plaintiff's sexual assault complaint and grievance is disputed, however.

The moving Defendants do not contest that Plaintiff adequately pleads the second element of the cause of action. That is, whether the adverse action that the respective Defendants took was sufficient to dissuade a person from engaging in that protected activity.

Rather, the focus of the moving Defendants' arguments concerns the third element: whether Plaintiff pleads that each of them was substantially motivated to take that adverse action because Plaintiff had engaged in protected activity. Thus, this Court focuses its analysis on this aspect of the First Amendment retaliation cause of action.

### B.    Defendant Hansen

Plaintiff was transferred from the San Carlos Correctional Facility to the Centennial Correctional Facility. ECF 1 at ¶ 73. Next, he was transferred to the Colorado Territorial Correctional Facility. *Id.* at ¶ 79. There, at Colorado Territorial, he could receive the full range of treatment that the hospital earlier had prescribed for his back condition. However, Defendant Hansen made the decision to transfer him away from there back to Arkansas Valley. *Id.* at ¶ 81. Although the Motion to Dismiss is inconsistent on this point, this Court assumes for present purposes that Defendant Hansen does join in the Motion to Dismiss [ECF 46] and seeks dismissal of the retaliation claim as raised against him.[5]

Plaintiff's retaliation claim against Defendant Hansen is based on his alleged decision to transfer him out "because McCarl had an ex-boyfriend or ex-husband who worked there." *See* ECF 46 at p. 11. Defendant Hansen argues that this is insufficient because it leaves unclear whether he acted with a retaliatory motive. According to Defendant Hansen, Plaintiff does not allege that he "took an adverse action against him *expressly because* he reported the alleged sexual assaults." *See id.* (emphasis in the original). While the pleading may not make that causal relationship express, it seems safe to assume that if Defendant Hansen transferred him out because Defendant McCarl had a former spouse or boyfriend there, then his decision does relate to Plaintiff's grievance about Defendant McCarl in some way. The implication is that Defendant Hansen lacked a legitimate reason to justify Plaintiff's removal from that location. One potential inference might be that Defendant McCarl's former spouse/boyfriend had a retaliatory motive against Plaintiff, and

---

[5] *See* ECF 46 at p. 5 (listing Defendant Hansen as one of the Defendants moving to dismiss the retaliation claim).

that Defendant Hansen was wrong to mitigate that potential threat by transferring Plaintiff away rather than to protect Plaintiff from the vengeful employee. Plaintiff may plead little detail, but this Court sees enough to support an inference of an improper motive. Consequently, the Motion [ECF 46] should be denied with respect to Defendant Hansen.

### B.    Defendant Fairbairn

As noted above, Plaintiff alleges that Defendant Hansen transferred him out of the Colorado Territorial Correctional Facility. From there, Plaintiff went to the Arkansas Valley Correctional Facility. That occurred in September 2022. Plaintiff alleges that while at the Arkansas Valley Correctional Facility, Defendant Fairbairn, who was the warden of that facility, denied him certain forms of medical care (certain equipment and a care aide) in retaliation for reporting the sexual assaults. While Plaintiff pleads nothing that overtly ties the denial of medical care to his grievance, he does allege that Defendant Fairbairn described him as "manipulative" and that the equipment and care aide were "detrimental." As Plaintiff frames it, Defendant Fairbairn and the other Defendants' denial of medical care occurred "within months after [Plaintiff] reported the sexual assaults and an OIG investigation was opened into the assaults." ECF 71 at p. 12. The timing of the conduct, when construing the inference in Plaintiff's favor, is significant. This Court finds some basis that could link Defendant Fairbairn's comments to Plaintiff's grievance about Defendant McCarl. Thus, the Court recommends that the Motion [ECF 46] should be denied with respect to him.

### C.    Defendants Gouty, Maul, and Velasquez

Plaintiff alleges that Defendants Gouty, Maul, and Velasquez also denied him needed medical care. However, Plaintiff does not say <u>why</u> they denied him medical care, much less make

any link to Plaintiff's First Amendment protected activity. Whereas Defendant Fairbairn was the facility's warden and thus presumably had access to Plaintiff's records to know about his sexual assault grievance, there is simply nothing in the pleadings that would support the inference that these three Defendants actually would have known about it (or would have reason to know about it). The simple fact that five months earlier at a different facility the Plaintiff had complained about sexual assault and the allegation that these three Defendants denied him medical care cannot support a reasonable inference of a retaliatory motive. As those Defendants put it, Plaintiff "simply assumes that any perceived adverse actions must have been taken in retaliation for his exercising his legal rights." ECF 46 at p. 12.

Plaintiff's attempt to buttress the allegation is unavailing. Plaintiff argues that the denial of medical care lacked any legitimate purpose, and he cites a "pattern of deprivations".  ECF 71 at p. 12. Both of those assertions are themselves inferences which the pleading strains to support. The argument also falls short of ascribing underlined individual culpability. Plaintiff's theory is that it must have been a First Amendment retaliation because there is no other explanation. While the absence of a legitimate reason for the adverse action (here, the denial of certain forms of medical care) may relate to a First Amendment retaliation analysis generally, there still must be a reasonable basis from which to reach the inference. Here, there is nothing that leads to the inference of a retaliatory motive. Because Plaintiff does not affirmatively plead the third element and provides nothing from which such an inference reasonably can be reached, this Court finds that the Motion [ECF 46] should be granted as to these three Defendants.

**D.    Defendant Goodsell**

In August 2023, Plaintiff was transferred from the Arkansas Valley Correctional Facility to the Centennial Correctional Facility. ECF 1 at ¶97. Defendant Goodsell was the Health Services Administrator at that facility. *Id.* at ¶98. Plaintiff alleges that Defendant Goodsell denied him a walker and a care aide. *Id.* For the same reason that Plaintiff's First Amendment retaliation claim fails against Defendants Gouty, Maul, and Velasquez, it also fails against Defendant Goodsell. There simply is nothing that ties Defendant Goodsell's medical decision to Plaintiff's grievance about Defendant McCarl, either expressly or that would reasonably support such an inference of retaliatory motive.

Thus, the Motion [ECF 46] should be granted as to Defendant Goodsell.

**E.    Summary**

Only the Motion to Dismiss at ECF 46 concerns Plaintiff's First Amendment retaliation claim. Of the Defendants who move to dismiss that claim, this Court disagrees with just two of them: Defendants Hansen and Fairbairn. This Court finds that as to them, Plaintiff does plead a sufficient basis from which an improper retaliatory motive could be inferred. However, the Complaint falls short of that minimum for the other moving Defendants. Therefore, this Court recommends that the Motion to Dismiss [ECF 46] be granted as to Defendants Gouty, Maul, Velasquez, and Goodsell.

The pleading against Defendants Gouty, Maul, Velasquez, and Goodsell is so minimal and those Defendants are so removed from the protected activity, it is difficult to see how Plaintiff could plead a First Amendment retaliation claim against them. Nevertheless, this Court recommends that the dismissal be without prejudice to amending the claim because there is still

the potential that Plaintiff could better state the cause of action against them.

## IV.    Qualified Immunity

In the above sections, this Court discusses those claims that Plaintiff brings against Defendants in their individual capacity under § 1983. Those Defendants who seek dismissal under Rule 12(b)(6) for the failure to plead plausible versions of those claims also seek dismissal on the basis of qualified immunity. ECF 46 at pp. 18-19; ECF 78 at pp. 9-10; ECF 94 at pp. 9-11.

### A.    General Rule

Qualified immunity protects from litigation a public officer whose possible violation of a plaintiff's civil rights was not clearly violative at the time of the officer's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "protects all but the plainly incompetent or those who knowingly violate the law." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The privilege is an entitlement not to stand trial or face the other burdens of litigation, and thus, it is immunity from being sued rather than a defense to liability. *See Ahmed v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006).

Overcoming qualified immunity requires the plaintiff to show that "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Smart v. City of Wichita*, 951 F.3d 1161, 1169 (10th Cir. 2020); *see also*, *Harris*, 838 F. App'x at 342. Courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

The first prong tests whether the official's actions violated a federal constitutional or

statutory right. A plaintiff's failure to plead a plausible constitutional claim under Rule 12(b)(6),

Fed. R. Civ. P., may lend support to finding that the plaintiff fails to overcome this prong of

qualified immunity. *See Montoya v. Vigil*, 898 F.3d 1056, 1064 (10th Cir. 2018). In this way, a

Rule 12(b)(6) analysis also relates to the qualified immunity analysis.

The second prong tests whether the right was clearly established at the time of the officer's

conduct. For a right to be "clearly established," its contours must be sufficiently clear that a

reasonable official would understand that what s/he is doing violates that right. "[E]xisting

precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v.

Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). A plaintiff "typically must identify 'an on-point

Supreme Court or published Tenth Circuit decision,' but also may look to the 'weight of authority'

from other courts." *Harris*, 838 F. App'x at 342. The clearly established right must be

"particularized to the facts of the case" and should not be defined "at a high level of generality,"

*id*., especially in the excessive force context. *City of Escondido v. Emmons*, 586 U.S. 38, 42-43

(2019). However, a case directly on point is not required so long as existing precedent has placed

the statutory or constitutional question beyond debate. *See A.N. v. Syling*, 928 F.3d 1191, 1197

(10th Cir. 2019). A general statement of the law can establish a right for qualified immunity

purposes if it applies with obvious clarity to the specific conduct in question. *See Ramirez v.

Reddish*, No. 18-cv-00176-DME-MEH, 2020 WL 1955366, at *4 (D. Utah April 23, 2020). "A

general constitutional rule already identified in the decisional law may apply with obvious clarity

to the specific conduct in question, even though the very action in question has not previously been

held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)).

**B.**     **Discussion**

Defendants do not assert qualified immunity protection because the constitutional right at issue is not clearly established. In the absence of a contrary argument, this Court finds no basis to grant them qualified immunity for this reason. For example, "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment." *Keith v. Koerner*, 707 F.3d 1185, 1188 (10th Cir. 2013).

Rather, Defendants claim the defense of qualified immunity on the basis of the first prong: whether they violated any constitutional right in the first place. It is true Plaintiff does not state plausible claims against several Defendants. Generally speaking, the subject Defendants would be entitled to qualified immunity for that reason. However, it is premature to say they are entitled to qualified immunity as a definitive matter. This is because this Court recommends giving Plaintiff leave to amend those claims, and thus there is the potential that Plaintiff can overcome the pleading defects to state plausible claims for relief.

Because it is premature to determine whether any of the moving Defendants are entitled to qualified immunity, all three Motions should be denied to the extent they seek dismissal on that basis.

**V.     Disability Discrimination**

As against the Colorado Department of Corrections ("CDOC"), Plaintiff brings two claims of disability discrimination. The first such claim is brought pursuant to 42 U.S.C. § 12131 and alleges violation of Title II of the Americans with Disabilities Act ("ADA"). The second such claim is brought pursuant to 29 U.S.C. § 701, and it alleges violation of Section 504 of the Rehabilitation Act. This Court considers them together because both causes of action involve the

same required showing. *See Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717, 726 (10th Cir. 2011)..

Prisons are "public entities" that must comply with both statutes. *See Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001).

Of the two causes of action, Plaintiff pleads no factual detail to support the Rehabilitation Act claim. Given the legal similarity between the two claims for relief, this Court considers both in light of how Plaintiff pleads the ADA claim.

### A.    Disability

Plaintiff must be a qualifying individual with a disability (ADA) or be a "handicapped individual" (Rehabilitation Act). *Cohon*, 646 F.3d at 725. Plaintiff pleads disability on the basis of "his spinal condition" which "substantially limited . . . his ability to walk." *See* ECF 1 at ¶ 163. He adds no other detail about his disability, such as what the spinal condition is or how it impairs his ability to walk. However, taking his pleadings on the whole, this Court presumes that the impairment relates to severe back pain. This Court adds that his disability presumably began in August 2022 because that is when he was prescribed the ambulatory and auxiliary aids (as well as the pain medication gabapentin). He does not plead that the underlying symptoms existed before August 2021. *Id.* at ¶ 75.

This Court assumes for present purposes that Plaintiff adequately pleads this element.

### B.    Denial of Access

Plaintiff must allege that he had sought some benefit for which he was qualified (Rehabilitation Act) or a public service, program, or activity (ADA) which he could not access. *Cohon*, 646 F.3d at 725. The public benefit or service that is the subject of Plaintiff's Complaint

is the ability of inmates "to move about the facility—for example, from their cells to the cafeteria." ECF 1 at ¶ 166. He lacked "meaningful access" to the CDOC's "programs and services" which are "obtained by moving around the facility". *Id*. at ¶ 167. Such loss of access did not only involve "meals," but also "showers, and recreation." *Id*. at ¶ 167. Plaintiff mentions these aspects elsewhere in his Complaint. He recalls that "[i]n July 2023, [his] condition progressed, and he could not make it to the food hall at Arkansas Valley to eat." *Id.* at ¶ 93. After he had fallen in the shower, his shower chair was returned to him. *See id*. at ¶ 89. He identifies a second fall incident in the shower. *See id*. at ¶ 95.

Plaintiff also must show how Defendant CDOC denied him access to those benefits or equal enjoyment of them. For this aspect of the claims, Plaintiff alleges that Defendant CDOC did so by denying him needed and prescribed auxiliary aids, such as his wheelchair, walker, and shower chair. *See id*. at ¶¶ 167, 169. Elsewhere in his Complaint, Plaintiff says that a cane alone is insufficient. *See id*. at ¶ 96.

Plaintiff does not describe the degree to which he lacked access. Presumably, the issue was not the complete lack of any access to the cafeteria, shower, or other prison areas, but rather, difficulty in accessing them, with occasional falls resulting in injury. Plaintiff also does not say that he sought reasonable accommodation through administrative grievance channels. Rather, Plaintiff frames this matter as a medical dispute. Although Plaintiff provides little context, this Court nevertheless assumes for present purposes that Plaintiff adequately pleads reduced access to and enjoyment of prison facilities because of a medical-related reason.

**C.     Discrimination**

The third element requires a causal relationship between the Plaintiff's disability and the denial of access. Plaintiff must plead that he was discriminated against solely because of his handicap (Rehabilitation Act) or was denied access by reason of his disability (ADA). *Cohon*, 646 F.3d at 725. In this respect—the causation requirement—there is a difference between the two statutes. Under the Rehabilitation Act, a plaintiff's disability must be the sole reason of the discrimination, whereas the ADA requires that the disability be a but-for cause of the discrimination. *See Crane v. Utah Dept. of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021).

Plaintiff leaves vague how exactly Defendant CDOC denied him access or discriminated against him. Plaintiff makes general reference to both intentional discrimination and the failure to make a reasonable accommodation. ECF 1 at ¶¶ 169-170. Both are permissible theories upon which to base an ADA claim. *Villa*, 664 F. App'x at 734. *See also, Duran*, 2024 WL 2939167 at *11. A claim under the Rehabilitation Act, by contrast, is limited to a showing of intentional discrimination (for example, as the reason for the refusal to make a reasonable accommodation). *See Barber* ex rel. *Barber v. Colo. Dept. of Revenue*, 562 F.3d 1222, 1228-29 (10th Cir. 2009).

The essential nature of the discrimination claim is that the Defendant CDOC denied him equal access <u>because</u> he is a disabled person. In other words, he was treated worse because he is disabled. It is in this respect—intentional discrimination—that Defendant CDOC seeks dismissal of these two causes of action. *See* ECF 46 at pp. 5, 20. This Court agrees with Defendant CDOC that the Complaint, even taken on the whole, does not show that kind of wrongdoing. One cannot reasonably infer that the CDOC denied him ambulatory aids because it sought to discriminate against him. This is the same result even under the ADA's less onerous, but-for standard.

Plaintiff frames this matter in medical terms, instead. It was the second hospital visit that generated the prescription for the ambulatory aids or other treatment measures. The walking impairment is the result of back pain. He blames medical staff (both medical care providers and medical administrative staff) for not providing the prescribed ambulatory aids. Notably, he does not allege any policy or fixed barrier that hinders his access to all areas of the prison. He does not allege that others with back pain and secondary walking impairment also face the same barrier to access that he does. He concedes that he was provided ambulatory aids and other forms of medical assistance at times, if inconsistently so. However, a dispute over the adequacy of medical care (such as whether the CDOC is providing prescribed treatment) is a matter outside the scope of the ADA. *See Savage v. Troutt*, 780 F. App'x 574, 578 (10th Cir. 2019); *Nasious*, 495 F. App'x at 902; *Rashad*, 4 F. App'x at 560.

Plaintiff concedes that he could have pleaded his ADA claim more clearly, *see* ECF 71 at p. 17, which by extension, would include his Rehabilitation Act claim. Thus, this Court recommends that the Motion to Dismiss [ECF 46] be granted, and that the ADA and Rehabilitation Act claims be dismissed to the extent Plaintiff bases them on intentional discrimination. Plaintiff offers nothing in his Response to support how he could bring a plausible discrimination claim. However, because he should be given leave to amend his Complaint in other respects, he should be given leave to amend this aspect as well.

This Court does not consider whether Plaintiff pleads a plausible failure-to-accommodate theory in support of his ADA claim because Defendant CDOC raises no such argument.

## VI.     Leave to Amend

Dismissal of a case is a harsh remedy, and as a general rule, a litigant should have the opportunity to amend the complaint and cure pleading defects. *See Hall v. Bellman*, 935 F.2d 1106, 1109–10 (10th Cir. 1991); *Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990). The Court does not find that filing a First Amended Complaint would be futile. This is the first ruling on the merits of Defendants' dismissal arguments, and there is the potential that Plaintiff can correct for the above-discussed pleading deficiencies.

## **<u>CONCLUSION</u>**

Accordingly, the Court respectfully recommends[2] as follows:

The Motion to Dismiss at ECF 46 be **granted in part** such that

(1)    the Third Claim for Relief (Deliberate Indifference/Failure to Protect) be dismissed as brought against Defendants Hartley, Fheure, Smith, and Ward.

(2)    the Fourth Claim for Relief (First Amendment Retaliation) be dismissed as brought against Defendants Maul, Gouty, Velasquez, and Goodsell.

(3)    the Fifth Claim for Relief (Deliberate Indifference to Serious Medical Need) be dismissed as brought against Defendants Maul, Gouty, Velasquez, and Goodsell.

---

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

(4)     the Sixth Claim for Relief (ADA) and Seventh Claim for Relief (Rehabilitation Act) be dismissed to the extent Plaintiff claims intentional discrimination.

The Motion to Dismiss at ECF 46 be **denied** in all other respects.

The Motion to Dismiss at ECF 78 be **granted**. As such, the Third Claim for Relief (Deliberate Indifference/Failure to Protect) be dismissed as brought against Defendants Church and Mascarenas.

The Motion to Dismiss at ECF 94 be **granted**. As such, the Third Claim for Relief (Deliberate Indifference/Failure to Protect) be dismissed as brought against Defendants Eddy, Galkowski, and Montano.

This Court recommends that the above dismissals be without prejudice to allow Plaintiff to file a First Amended Complaint.

DATED at Denver, Colorado, this 31st day of January, 2025.

BY THE COURT:

_____
Timothy P. O'Hara
United States Magistrate Judge